THE DEPARTMENT OF TRANSPORTATION, Petitioner-Appellant, *v.* JOAN MARIE MULLEN *et al.*, Defendants-Appellees.

Fourth District   No. 4—82—0550

Opinion filed December 20, 1983.

Neil F. Hartigan, Attorney General, of Springfield (William B. Lawrence and Ronald N. Hanley, Special Assistant Attorneys General, and Roy Frazier, Assistant Attorney General, of counsel), for appellant.

Thomas N. Jacob, of Jacob, Goleash and Misch, of Bloomington, for appellees.

JUSTICE MILLER delivered the opinion of the court:

In this condemnation action brought by the Department of Transportation judgment was entered on the jury's verdict of $176,580 for the value of the land taken, 2.39 acres, and $107,000 for damage to the land remaining. The Department appeals, arguing that the amount of the award is attributable to the trial judge's erroneous evidentiary rulings. We agree that some of the rulings were in error and reverse and remand for a new trial.

The Department filed a petition December 2, 1976, to acquire five parcels of land in Livingston County to straighten and widen Illinois Route 23 (Federal Aid Route 24). Compensation for four of the five parcels was fixed by agreement; the fifth parcel, numbered "66," went to trial instead and is the subject of this appeal. Parcel 66 comprised two small tracts: (1) a strip 1,800 feet long and varying between 10 and 150 feet wide, 1.637 acres in all, lying along the eastern side of Route 23, which runs northwesterly through the area, and (2) .753-acre, concentrated mainly in a triangle, on the western side of Route 23 and across from the first tract. Parcel 66 was part of a 58.75-acre holding near Cornell, Illinois, owned by the 10 personal

defendants, who are Hatzer family siblings and their spouses; Route 23 divided the property nearly in half. All or most of this land was leased to defendant Valley View Dirt and Gravel, Inc., a Hatzer family company. Valley View's lease was subject to a mineral lease between the Hatzer family and defendant Clow Corp. on land east of Route 23, where a shale pit was located; under a mining agreement Valley View removed the shale and delivered it to Clow's plant in Carol Stream, Illinois, for the production of clay pipe and tile. On the Hatzers' land west of Route 23 Valley View owned and operated a mobile home park.

Valley View, Clow, and the personal defendants filed cross-petitions to recover for damage to the remainder caused by taking the first tract, the one on the eastern side of Route 23; no cross-petitions were filed for damage caused by taking the second, western tract.

Several separate problems of valuation are evident. The eastern tract contained an earthern embankment that kept floodwaters from reaching the shale pit. Also, the effect of taking the eastern tract was to push back the existing setback line required for open pit mines, thus reducing the area that could be mined in the future. The western tract included part of the mobile home park. The questions raised on appeal concern the exclusion and admission of evidence on the value of the two tracts and on the damage to the remainder caused by taking the first tract. The Department argues that the trial judge erred in striking the testimony of one of its appraisal witnesses, Francis Gutschenritter, that the trial judge should have granted its motion to strike the testimony of the defendants' appraisal witness, Campbell Evans, and that the trial judge erred in not allowing it to unilaterally stipulate that it would not disturb the embankment on the eastern tract. The Department requests a new trial.

Before trial the Department filed a motion *in limine* to prevent the defendants from (1) introducing evidence on the profits that Valley View and Clow stood to lose as a result of taking tract 1, (2) using the income method of valuation for determining the value of the take, and (3) valuing the mineral—shale—separately from the fee. The motion was denied.

The trial began September 24, 1979. The Department's first witness, Herbert Voigts, the appraisal manager for the highway district in which the land in question is located, described the purpose and extent of the take. The jury then viewed the premises.

Wayne Kasza, an engineer from the highway district, testified that the embankment or dike on the eastern side of Route 23 had been enlarged since the Department filed its petition to condemn. The

increase in size meant that part of the embankment would be included in tract 1; it would not have been affected had it remained in its former state.

Francis Gutschenritter, whose testimony was stricken on the defendants' motion, was a professional real estate appraiser. He had inspected the area of the take and had visited Clow's plant in Carol Stream. Gutschenritter testified that the highest and best use of the north part of the Hatzers' land east of Route 23 was the shale pit. The area south of this was a floodplain, useful only for recreation and wildlife. Gutschenritter believed that the highest and best use for the land west of Route 23 was the mobile home park. He also testified that the shale pit was consuming about one-quarter to one-half acre of surface area every year; 25 acres remained, and he estimated that the shale operation would last 25 to 100 more years.

Gutschenritter testified that the fair market value of the entire holding, 58.75 acres, on the date the Department filed its petition, December 2, 1976, was $176,250, that the value of the land remaining was $169,000, and that the value of the take was therefore $7,200. He did not believe that the take was damaging the land remaining. Gutschenritter based his appraisal on the state of the shale industry and on recent comparable sales of farmland in that township; the farmland had been sold for $4,000 to $4,500 an acre. He believed that the land being taken was inferior to farmland and assigned it a value of $3,000 per acre. Gutschenritter added $500 for the cost of moving a sign that stood on the western tract in the mobile home park. Therefore, total compensation should be $7,700.

Defense counsel moved to strike Gutschenritter's testimony because he had mentioned several uses for the land—the shale pit, recreation and wildlife, and the mobile home park—yet had based his appraisal on sales of farmland. The trial judge granted the motion and instructed the jury to ignore the testimony.

The Department then examined James Johnson, Clow's plant manager at Carol Stream, as an adverse agent under section 2–1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 2–1102). Johnson explained that shale is used in making clay sewer pipes. Clow's demand for shale was enlarging the pit on the Hatzers' land by about five-eighths acre a year; Clow used 58,000 tons from the pit in 1976.

Herbert Voigts then testified for the Department again. Voigts did appraisals privately in his off-duty hours; he testified that the entire property was worth $250,000 as of December 2, 1976, that the value of the remainder, after the take, was $240,000, and that the value of

the take was therefore $10,000. The highest and best uses of the land were the current, commercial uses. The Department then rested.

Richard Hatzer, one of the defendants, testified about the general operations of the shale pit and the mobile home park. He explained that the State's mining rules and regulations require setbacks from highway rights-of-way: the setback must be 10 feet plus 1½ times the depth of the .pit. The shale pit was 80 feet deep and therefore required a setback of 130 feet. The tract being taken on the eastern side of Route 23 lay entirely on the area of the current setback. The condemnation will push back the existing setback line, however, preventing mining in an area that could otherwise have been mined. Also, that tract contained an embankment 900 feet long that kept floodwaters out of the shale pit.

Hatzer said that they had changed the embankment since 1976 only by raising it a foot or two in some areas and that the cost of building a new one would be $165,400. He also testified that the shale pit will eventually consume the southern land that the Department classified as a floodplain.

John Duffy, general superintendent of Trico Paving Company, testified that the embankment will be lost in the take and that a new one will have to be built, which will cost $200,910.

David Schmelig, a consulting engineer, testified that the new setback required after the eastern tract is taken will cost the Hatzers 40,351 square feet of surface area, slightly less than an acre.

Robert Morse, a geotechnical engineer and engineering geologist, interpreted the logs of borings that an engineering firm had made in this vicinity. The logs showed a thick layer of shale lying between 17 and 74 feet from the surface, interrupted only by a thin seam of coal .8 foot thick, leaving a 56.2-foot layer of shale. Morse then subtracted a foot from this for waste, leaving 55.2 feet of recoverable shale. Morse computed that the new setback area of 40,351 square feet covered 82,505 cubic yards of shale, or 183,574 tons—one cubic yard of shale weighs 4,450 pounds. Morse said that the overburden in the area is unusually thin, making this shale deposit unique.

Campbell Evans, a professional real estate appraiser and a professor of finance and insurance at Illinois Weslyan University, was the defendants' appraiser and last witness. Evans, in preparing his appraisal, had examined the land, talked with the other witnesses, and read Valley View Dirt and Gravel's financial statement for 1976 and various leases and agreements. As of December 2, 1976, the highest and best use of the western tract was for a trailer court, the existing use; the highest and best use of the land where the embankment was

located was for an embankment; the highest and best use of the shale pit was for a shale pit. Evans said that the fair market value of the entire 58.75-acre holding on December 2, 1976, was $468,939, based on the three distinct uses. The value of the land taken was $185,160, and the damage to the remainder was $164,661. The damage to the remainder was based on lost income for the family and on losses to Valley View and to Clow. Evans explained that Clow had a very favorable lease with the Hatzers; most of Valley View's income came from the agreement, between it and Clow to excavate and transport the shale; the 185,000 tons of shale lying beneath the new setback represents slightly more than three years' production, based on the figures for 1976. Evans said that he could not find any comparable sales of shale pits and asserted that the shale pit and the embankment were special uses.

In an offer of proof during the cross-examination of Evans, the Department elicited the testimony that the pit had a useful life of 81 more years, based on production in 1976 and its size after the new setback line.

In rebuttal, Wayne Kasza testified that the Department would not disturb the embankment after the take, and the Department attempted to enter a stipulation to that effect; the trial judge denied it. Herbert Voigts testified that the remainder will not be damaged by the take.

## I

Before discussing the specific questions raised here on appeal, we set forth some basic principles of valuation governing condemnation actions. These principles point to the solutions of the problems presented in this appeal.

The Department's power of eminent domain derives from article I, section 15, of the State Constitution (Ill. Const. 1970, art. I, sec. 15), which says:

> "Private property shall not be taken or damaged for public use without just compensation as provided by law. Such compensation shall be determined by a jury as provided by law."

The statute dealing with valuation, section 7—121 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 7—121), says in part:

> "Except as to property designated as possessing a special use, the fair cash market value of property in a proceeding in eminent domain shall be the amount of money which a purchaser, willing but not obligated to buy the property, would pay to an owner willing but not obliged to sell in a voluntary sale,

which amount of money shall be determined and ascertained as of the date of filing the complaint to condemn."

■ This generally applicable standard of valuation, based on an imagined arm's length, voluntary conveyance of the property in question, excludes estimates of lost income or reproduction costs. In *Chicago Land Clearance Com. v. Darrow* (1957), 12 Ill. 2d 365, 146 N.E.2d 1, the owners of a flophouse that had been condemned in a program of slum clearance tried to introduce evidence of the net income from their business and of the cost of reproducing the building. The trial court did not let this evidence in, and the supreme court affirmed that decision. The supreme court said:

"That the measure of just compensation is the fair, cash market value at the time of filing the petition in eminent domain proceedings is not open to question. Evidence of net income derived from operating a business on the condemned property is not admissible and it not a basis for fixing compensation whenever the property has a market value. [Citations.] There are a few types of improved property of which the market value cannot be ascertained because it is applied to a special use, such as a church, college, cemetery, club house, terminal of a railroad, and the like. [Citation.] As to these types of property, which are in effect exceptions, the law permits a resort to any evidence available to prove value including the net income from a business conducted on the property." (12 Ill. 2d 365, 372, 146 N.E.2d 1, 5.)

Although the owners in that case did not argue that their property, a hotel, was a special use, they did argue that the realty and not the business produced the net income. The court rejected that.

■ When only a part of the owner's parcel of land is being taken, recovery for damage to the land remaining is limited to its depreciation or diminution in fair market value caused by the take. *Department of Public Works & Buildings v. Bloomer* (1963), 28 Ill. 2d 267, 191 N.E.2d 245.

■ The interests compensable in a condemnation action include leaseholds. (*Leonard v. Autocar Sales & Service Co.* (1945), 392 Ill. 182, 64 N.E.2d 477.) A mineral lease, under which the lessee pays a royalty rather than a straight rent, is a compensable interest. *Department of Public Works & Buildings v. Blackberry Union Cemetery* (1975), 32 Ill. App. 3d 62, 335 N.E.2d 577.

II

■ Turning to the specific questions raised on appeal, we shall

first address the Department's argument that the trial judge erred in striking the testimony of one of its appraisers, Francis Gutschenritter. In support of that decision, the defendants argue that Gutschenritter's valuation, which he based on sales of local farmland, was without foundation and impeached by his own statements on cross-examination that the shale pit was a special use.

We agree with the Department that Gutschenritter's testimony was competent and admissible. First, whether property qualifies as a special use, as that term of art is understood in condemnation proceedings, is a question of law for the courts to decide. Second, the colloquy surrounding Gutschenritter's statements shows that he considered the pit a special use because it had no other use. This, however, is not the legal definition of "special use"; property is classified as a special use only if it has no readily ascertainable market value (*Darrow*), which is something quite different from its unsuitability for other uses.

The Department was not required to adopt the defendants' theory of valuation. Gutschenritter qualified himself as an expert witness, and his appraisal was admissible evidence. The defendants' objections to his testimony pertain to the weight the trier of fact should accord it, not to its admissibility.

We next consider the testimony of the defendants' appraiser, Campbell Evans, and the Department's objections to it. The Department argues that Evans relied on speculative assumptions in reaching his appraisal of the value of the land taken and the damage to the land remaining.

Evans testified that in valuing the land taken on the western side of Route 23, he relied on the income that Valley View could expect to lose from its operation of the mobile home park by its loss of that area; in valuing the land on the eastern side of Route 23, he relied on the cost of replacing the embankment. In valuing the damage to the land remaining on the eastern side of Route 23, Evans relied on the income that Valley View, Clow, and the Hatzer family could lose as a result of the new setback required by the take, which would reduce the surface area that could be mined. In computing the damage to the remainder, Evans set forth the separate losses of Valley View, Clow, and the Hatzer family.

The mineral lease between Clow and the Hatzer family provided a royalty of 15 cents per ton of shale. Evans determined that the shale was worth 60 cents per ton to Clow, which meant that the value of its loss was 45 cents per ton, the difference between the two figures. Finally, Evans computed an amount representing Valley View's lost

profit based on the share that the excavation and delivery of the shale bore to its total business; Evans adjusted that by a sum representing new business that it could probably obtain. In reaching the separate monetary values of these damages, Evans relied on Morse's computation of the content of shale lying under the new setback that the take would impose. This lost shale represented 3.17 years' production, based on the figures for 1976, and Evans discounted the amounts by 12% over that period of time. With all these details in evidence, the trial judge erred in restricting the Department's cross-examination of Evans on the expected productive life of the pit.

In support of Evans' testimony the defendants argue that the embankment and the shale pit were special uses and therefore justified the introduction of evidence on income and replacement cost.

*Department of Public Works & Buildings v. Oberlaender* (1969), 42 Ill. 2d 410, 247 N.E.2d 888, presented a similar problem of valuation; in that case the Department condemned 44 acres of a sand pit for the construction of a highway. To be sure, the landowner did not argue that the pit was a special use; the appellate court said in its opinion, "In the instant case it is not contended that [the] property is a special use property nor could such contention be supported" (*Department of Public Works & Buildings v. Oberlaender* (1968), 92 Ill. App. 2d 174, 182, 235 N.E.2d 3, 8). At the trial of that case several of the landowner's appraisers assigned separate values to the amount of sand being lost in the take; the supreme court held that that testimony should have been stricken. The court said:

> "Concerning the fair market value of land containing mineral deposits this court has stated that: 'The rule is that compensation must be estimated for the land as land, with all its capabilities, and if there is timber on it, or coal, oil or other minerals under the surface, they are to be considered so far as they affect the value of the land but they cannot be valued separately.' [Citations.] Putting it somewhat differently, where, as here, the property is not taken for the purpose of obtaining the minerals or a going business [citations], it is improper to appraise separately the mineral deposit and add its value to the value of the land without the deposits [citations]. It is proper, however, for the owner to establish the existence of valuable mineral deposits on the real estate being valued and in doing this to show the character of the deposit(s) and to what extent it enhances the land's market value. [Citations.]" 42 Ill. 2d 410, 415-16, 247 N.E.2d 888, 892.

This suggests that a quarry or pit is not to be valued as a

special use. *Department of Transportation v. Toledo, Peoria & Western R.R. Co.* (1979), 75 Ill. 2d 436, 389 N.E.2d 546, supports this interpretation. In *Toledo* the Department condemned about 43 acres of land as a source of fill material needed for a nearby highway project. Relying on *Oberlaender*'s statement, "[W]here, as here, the property is not taken for the purpose of obtaining the minerals," the landowner argued that it should be allowed to introduce into evidence what a subcontractor of the Department had been paying it for this fill material before the condemnation petition was filed; the landowner wanted to multiply the price by the amount being condemned. The court said that that was contrary to the rule in *Oberlaender*.

■■ Evans' computations of the damage to the remainder ran afoul of the rules in *Oberlaender* and *Toledo* and were vitiated by speculative assumptions. He assumed that the new setback would take land that otherwise eventually would have been mined. This presupposed that the demand for shale would continue at a set rate, not just into next year or the next decade, but into the next century. The damage is neither immediate nor certain. The land in the new setback area is not at the edge of the shale pit; other land will have to be mined first. The demand for clay sewer pipe may lessen as plastic pipe takes a larger share of the market, as testimony suggested. Thus, appraisals based on the land's cubical content of a mineral are too speculative. This applies here to the separate losses of Valley View, Clow, and the Hatzer family. Although each of them has a compensable interest—a point that the Department does not dispute—compensation must be based on certainty rather than conjecture. And even when the loss of a natural resource is certain, testimony valuing the resource separately from the land is improper, for its effect is to "lead to all sorts of collateral issues as to expenses, transportation and other matters taken account of by the witness, which would be confusing in the extreme" (*Forest Preserve District v. Caraher* (1921), 299 Ill. 11, 18, 132 N.E. 211, 213). Recovery for damage to the remainder, which the owner has the burden of proving, is measured by "the depreciation in value of the land not taken which results from the taking, that is, the difference between the fair cash market value of the part not taken unaffected by the improvement and its fair cash market value as affected. [Citation.]" *Department of Public Works & Buildings v. Bloomer* (1963), 28 Ill. 2d 267, 270, 191 N.E.2d 245, 248.

■ In valuing the tract taken on the eastern side of Route 23, Evans relied on the cost of replacing the embankment. We agree with the Department that the embankment does not qualify as a special

use and therefore its replacement cost was inadmissible. The embankment has value only in relation to the shale pit. The separate valuation of the embankment—the testimony of the cost of a replacement—divorces it from its only function. Standing alone, the embankment has no use, much less a special one; as a man-made alteration of the local topography, the embankment gains a purpose and a value only when it is considered along with the shale pit that it may or may not protect. Therefore, the embankment must be considered as part of the general operation of the shale pit, which is not a special use. Although the destruction of the embankment might cause damage to the remainder, we reject the contention that the embankment is a special use.

Finally, Evans bases his appraisal of the tract on the western side of Route 23 on the expected profits from the then-vacant trailer pads on that tract, assigning a value to each one. This was improper. A mobile home park is not a special use, and this land did not require a departure from the general rule that an appraisal must be based on the property's fair market value.

Despite the several interests involved here—the Hatzers, Clow, and Valley View—the owners agreed to the use of a verdict form that required the jury to be precise about only two things: the value of all the land taken and the damage to the remainder. That verdict form was Illinois Pattern Jury Instruction, Civil, No. 300.70 (2d ed. 1971). The individual defendants did not request separate verdict forms for their respective interests. Because one verdict form was to be used, it was error to allow testimony concerning the values of the separate interests of the individual defendants, which could have inflated the verdict. Where separate verdict forms for individual defendants are to be used, the testimony is proper.

A related problem concerns the several uses of the property. The evidence shows that the land being taken does not have a single, uniform highest and best use; instead, the land is employed and employable in several ways. Evans' testimony assigned separate figures to the uses. We have already said that his appraisals were flawed by his use of the income method of valuation. This infirmity does not mean, however, that on retrial the owners are barred from presenting evidence on the separate and distinct uses of the property. We must inquire to what extent the owners may introduce evidence on the separate uses and separate values of the two parcels of land being taken.

In *Department of Public Works & Buildings v. First National Bank* (1973), 9 Ill. App. 3d 633, 292 N.E.2d 487, the owner's valuation witness testified that the condemned property, a tract of a little

more than four acres out of a holding of about 49 acres, had several highest and best uses. According to the witness, one part of the land being taken was best suited for a service station, a second part was best suited for other commercial development, and a third part was best suited for residential use. Although the property was employable in these several distinct ways, only once did the valuation witness testify to a separate value of one of the several parts and the trial judge sustained the condemnor's objection to the testimony.

On appeal the condemnor argued that the owner's witness should not have been allowed to testify to the several highest and best uses. The court held that the testimony was proper:

> "It is clear from the testimony of most of the witnesses for both petitioner and defendant that the highest and best use of the property was not uniform throughout. Under these circumstances we find nothing improper in testimony as to the highest and best use for the different tracts of land involved. *Forest Preserve Dist. of Cook County v. Wing*, 305 Ill. 194, 137 N.E. 139; *Department of Public Works and Buildings v. Hufeld*, 68 Ill. App. 2d 120, 215 N.E.2d 312." 9 Ill. App. 3d 633, 636, 292 N.E.2d 487, 489-90.

In *Department of Public Works & Buildings v. Hufeld* (1966), 68 Ill. App. 2d 120, 215 N.E.2d 312, the condemnor was taking about 62 acres out of a holding of about 100 acres of land, which the owner had planned to subdivide. The owner's plan divided the holding into three separate areas, and at the time the petition for condemnation was filed, they were in various stages of completion. Several houses had already been built in one area, and streets and other public improvements had been made; a plat of the second area had been recorded, and rough grading had been done there; a plat of the third area had been prepared but not recorded, and that land had not been touched. The parties' valuation experts agreed that the highest and best use of all the land was residential. The condemnor's appraisal witnesses, in arriving at their estimates, considered and valued the three areas separately, and the jury heard testimony on the different values of the distinct areas.

On appeal the landowner argued that he should have been allowed at trial to use the "subdivision theory of valuation," which the court described as "basically a projection of future values and advantages which in and of themselves are considered to be the value of the property." (68 Ill. App. 2d 120, 128, 215 N.E.2d 312, 316.) The owner thought that the condemnor's appraisers had used this in valuing the first, more developed area and that therefore the theory should have

been applied to the entire take. The court first noted that the condemnor's witnesses had not actually used the suggested theory and then justified their valuing the areas separately. The court said:

> "Valuing a group of developed lots, taking into account the individual values and cost of development, does not necessarily involve the approach proposed by Appellant. In any event, the character of the actual use and potential use of areas 2 and 3 was markedly different from that of area 1 and under these circumstances different considerations were involved. Testimony of Appellee's witnesses appropriately considered the actual and potential uses of areas 2 and 3 on a different basis than those of area 1." 68 Ill. App. 2d 120, 128, 215 N.E.2d 312, 316.

In *Forest Preserve District v. Wing* (1922), 305 Ill. 194, 137 N.E. 139, most of the land being taken was on the western side of a river, and one acre was on the eastern side. Both parts were unimproved. One question on appeal was whether the owner should have been allowed to introduce evidence valuing the one acre on the eastern bank separately; apparently its value was enhanced by providing frontage for residential lots. The supreme court held that excluding this evidence was not error. The court said:

> "Denial by the court of such separate proof does not mean that appellant did not receive the full value of the acre east of the river at its value for frontage or riparian purposes, such value being necessarily reflected in the price fixed by the witnesses who testified as to the value of the whole tract. In support of her theory appellant offered evidence on the trial that the acre tract was available for such use, and one of her witnesses testified that he considered such use in fixing the value placed by him on the tract as a whole. It is therefore plainly apparent that she received the benefit of this proof." 305 Ill. 194, 197, 137 N.E. 139.

These cases support the conclusion that on retrial the appraisal witnesses may testify to the different highest and best uses of the two parts of the property taken. Also, the special circumstances presented by this case—the two tracts being taken are noncontiguous, and their highest and best uses are demonstrably different—invite testimony on their separate values as well. The property being taken comprises two distinct tracts, which was not the case in *Department of Public Works & Buildings v. First National Bank* (1973), 9 Ill. App. 3d 633, 292 N.E.2d 487, and in *Department of Public Works & Buildings v. Hufeld* (1966), 68 Ill. App. 2d 120, 215 N.E.2d 312. The land being taken has more than one highest and best use, which was

not the case in *Forest Preserve District v. Wing* (1922), 305 Ill. 194, 137 N.E. 139, and in *Hufeld*. Thus, regardless of whether the parties use a single verdict form for valuing the total land taken, as was done in the trial below, or instead request separate verdict forms for each part of the take, the appraisal witnesses may testify to the different highest and best uses of the two tracts taken and to their separate values. This must be distinguished from testimony on the different losses of the individual defendants which in the absence of a separate verdict form for each defendant would be irrelevant, confusing, and likely to lead to an inflated recovery.

Because of these errors, a new trial is necessary. If on remand the Department attempts to stipulate, in a timely manner, that it will not alter, disturb, or affect the embankment by taking the tract on the eastern side of Route 23, it should be allowed to do so. See *East Peoria Sanitary District v. Toledo, Peoria & Western R.R.* (1933), 353 Ill. 296, 187 N.E. 512 (offer to reduce damage to land taken).

Reversed and remanded.

TRAPP and GREEN, JJ., concur.